IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY DIVISION

**FILED**

JUL 2 7 2007

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

MICHAEL MERRITT KOSTENKO

    Plaintiff,

v.

Case # 5: 07 - 0462

MOHAMMAD RANAVAYA

JAMES B. BECKER

CHRISTOPHER J. MARTIN

EDWARD J. DOYLE

DAVID L. CARAWAY

RANDALL L. SHORT

THE AMERICAN BOARD OF INDEPENDENT MEDICAL EXAMINERS

GREGORY S. BURTON

THOMAS J. OBRAKTA JR.

BRICKSTREET INSURANCE

WELLS FARGO INSURANCE

BOWLES, RICE, MCFADDEN, GRAFF, AND LOVE

JACKSON KELLY

MASSEY COAL

PEABODY COAL

EASTERN ASSOCIATED COAL

GOVENOR JOE MANCHIN III

WV ATTORNEY GENERAL DARRELL MCGRAW

    Defendants

## Index

| | |
|---|---|
| Page 1 | Preface to a complicated civil RICO case |
| Page2 | Jurisdiction and venue |
| Page 3 | Plaintiff |
| Page 4 | Defendants |
| Page 5 | Nature of the case |
| Page 25 | The enterprise scheme to Plaintiff |
| Page 85 | Predicate evidence to the claim of extortion under color of official right-Notice of Termination |
| Page 123 | Predicate evidence to the claim of extortion under color of official right-Occupational claims denials |
| Page 145 | Predicate acts by West Virginia Government to further enterprise scheme |
| Page 168 | Discussion |
| Page 181 | Damages (preliminary) |
| Page 184 | Counts |
| Page 188 | Relief |

## **Preface to a complicated civil RICO case**

Webster's defines that evil is something that brings sorrow, distress or calamity, that evil is the fact of suffering, misfortune, and wrongdoing, that evil is morally reprehensible, that evil arises from actual or reputed bad character or conduct, that evil causes harm.

Webster's defines the evil-doer is one who does evil, that evil-doing is the act or action of doing evil.

The evil alleged by this action is banned or inhibited by social custom, emotional aversion,

Is banned or inhibited by the moral and ethical guides of the Nuremberg code, Helsinki declaration, and the Belmont Report,

Is banned or inhibited by the purpose of federal labor law in the Occupational Safety and health Act and the Mine Safety and Health Act,

Is banned or inhibited by federal Health and Human Resources law and purpose, West Virginia Public Health law, and the former West Virginia State Workers Compensation law.

The evil-doers use deceit and coercion in conspiracy, motivated by the financial liability of the harm, sorrow, suffering and calamity caused by their evil actions, motivated by the moral reprehensibility of their evil conduct, to fraudulently deny from and exclude from use, approach or mention, the object, word and act of their evil conduct.

Opportunity of conspiracy is afforded by the overwhelming economic power and the ideology of the conspirators, to corrupt and influence the democratic process, in violation of federal RICO purpose and law, as Congressional

1

statement of findings and purpose Section 1 of Pub. L. 91-452 provides in part that: *"The Congress finds that (1) organized crime in the United-States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and corruption; (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors ---, and other forms of **social exploitation**; (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and **corrupt our democratic processes**; (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with "free competition, seriously **burden interstate and foreign commerce**, threaten the domestic security, and **undermine the general welfare of the Nation and its citizens**; and (5) organized crime activities in the United States continues to grow because of defects in the evidence-gathering process of the law inhibiting the development of the legally admissible evidence necessary to bring criminal and other sanctions or remedies to bear on the unlawful activities of those engaged in organized crime and because the sanctions and remedies available to the Government are unnecessarily limited in scope and impact.*

This action is a civil claim that must argue and define what may be otherwise a complex criminal enterprise.

## JURISDICTION AND VENUE

- This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § § 1961, 1962, 1964, 15 U.S.C. § 1 *et seq.*, and 28 U.S.C. § § 1331, 1337 and 1367. The Court has personal jurisdiction over the defendants pursuant to 18 U.S.C. § § 1965(b) and (d).
- Venue is proper in this district pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b).

2

## Plaintiff

Dr. Kostenko is an osteopathic physician licensed to practice in West Virginia, with business address at 3050 C&O Dam Road, Daniels WV 25832. Dr.

Dr. Kostenko had been a provider of medical evaluation and treatment services through the West Virginia State Worker Compensation Commission from about 1990 until February 10th 2005.

## Defendants

The enterprise is comprised of "persons" within the meaning of U.S.C. §18, 1961(3) with individuals, partnerships, corporations and associations in union associated in fact although not a single legal entity as an "enterprise" defined by U.S.C. §18, 1961(4).

The defendants are "persons" who have willfully committed a "pattern of racketeering activity" within the meaning of U.S.C. §18, 1961(5).

With respect to the overt acts and activities alleged herein, each Defendant conspired with each other and with others not named as Defendants in this Complaint, to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

### Medical element individual members
- Mohammad Ranavaya MD
- James Becker MD
- Chris Martin MD
- Doyle MD
- Caraway MD
- Short DO

### Medical association members
- The American Board of Independent Medical Examiners

3

**Insurance element individual members**

- Greg Burton
- Obrokta Jr. JD

**Insurance industry element corporate members**

- Brickstreet
- Wells Fargo

**Law Firm element member**

- Bowles, Rice, McFadden, Graff and Love
- Jackson Kelly

**Industry**

- Massy Coal
- Peabody Coal
- Eastern Associated Coal

**West Virginia State Government**

- Governor Joe Manchin
- State Attorney General Darrell McGraw

**Persons who are as yet unnamed members of the enterprise**

## Nature of the case

This action groups the defendants into four elements of the RICO enterprise. These are the medical, insurance, industry and law firm elements. The named Government Defendants further the enterprise scheme as means to political ends.

The medical element is composed of two principle components. The individual physicians who served as appointed public officials and employees within the former West Virginia State Workers Compensation Commission and the named medical associations.

4

The named and un-named physicians to this action are Physicians who were appointed or otherwise employed by the Compensation Commissioner as public officials within the former West Virginia Workers Compensation Commission. These physician public officials had lawful duty to the West Virginia Worker.

Duty included that defined by statute for these physicians to form medical evaluation guidelines, medical treatment guidelines, and disability duration guidelines per W. Va. Code § 23-4-3b. (a),(b),(e). Duty included the acts of ministerial functions of these physicians within the Commissions Office of Medical Services to determine the admissibility of worker claims for occupational disease. As such, these physicians were, as a group, empowered by the legal authority of the State of West Virginia to control medicine through acts of medical guideline formation and acts in determining admissibility of worker occupational disease as evidence to the formation of these guidelines.

The named and un-named physician public officials to this action had duty to the lawful medical risk management of the West Virginia worker.

Medicine to this action includes Work Loss Data Institute (WLDI), a fraudulent enterprise medical guideline formation association.

Medicine to this action includes the American Board of Independent Medical Examiners (ABIME), a fraudulent enterprise board certifying association enforcing the independent medical examination by the physician to the dependence of WLDI evaluation guidelines and to enterprise purpose

**Industry**
The named Industry of this action are the coal companies Massy Coal, Peabody Coal and Eastern Associated. This industry, and unnamed industry, is involved with modern industrial development in West Virginia, particularly the mining and processing of coal. Such mining activity is notoriously contentious in its

5

impact of occupational coal dust disease to the coal miner, as evidenced by common history and the reality of federal pneumoconiosis programs.

This Industry is of paramount importance for the commerce of the country as defined by Congress in the Mine Safety and Health Act.

Whereas injury is assumed to heal, occupational disease tends to be chronic and progressive. Occupational disease, other than pneumoconiosis inherent to the Coal Mining industry, includes disease influenced by worker exposure to welding fumes, organic solvents, coal preparation plant chemicals, kiln dust treatments of coal refuse piles, chemical belt splicing solvents, float-sink testing solvents and long wall emulsion. The hazardous nature of the agents inherent to this work have been defined by the agencies with lawful authority to define such under the Mine Safety and Health Act and the Occupational Safety and Health Act. The toxicant hazards inherent to these industries is well defined and not an issue to this claim.

It is the recognition of and both real and potential liability to industry of occupational disease influenced by worker exposure to known chemical "toxicant" hazards inherent to this industry, and the cost of occupational disease flowing from such, is the interest of the Industry element to the enterprise.

**Insurance**
The named individual members to the enterprise include the former Executive director of the West Virginia Workers Compensation Commission, Greg Burton and chief legal council to the former commission, Obrokta Jr. JD. Burton and Obrokta Jr. JD are now President and Vice President of BrickStreet, the privatized employers mutual insurance company that was the former West Virginia State Workers Compensation.

6

The named insurance industry members are BrickStreet and Wells Fargo. Wells Fargo on its internet site claims to by the largest business insurer in the country, and owns Acordia that has been a principle "third party administrator" of workers compensation claims in West Virginia. Parent Company Wells Fargo has assumed the third party workers compensation insurance coverage of Acordia.

**Law Firms**

Bowles Rice McDavid Graff & Love PLLC is the named law firm member of the enterprise. This law firm was principle in exploiting the means of the enterprise risk management scheme to represent the legal interest of Industry in denying workers compensation claims, and in politicizing the enterprise scheme as ideology to the government.

**West Virginia State Government**

The Office of the Governor and the Office of the State Attorney General have assumed the common unlawful purpose of the enterprise of the enterprise as political ideology for personal and political benefit.

**The enterprise risk management scheme.**

The common and un-lawful purpose of the enterprise is to limit the cost of occupational disease and environmental disease by the fraudulent concealment of occupational toxicant hazards inherent to industry in West Virginia, and the fraudulent concealment of the evidence of worker occupational disease.

This enterprise risk management scheme hinders commerce as defined by congress by purpose of federal health and safety law protecting the worker. This enterprise risk management scheme hinders the lawful medical risk management of the West Virginia worker as per former West Virginia Workers Compensation Commission statute, and the purpose of the Industrial Council that now administrates these issues within the state Insurance Commission.

7

The means of the enterprise scheme requires the ongoing corruption of medicine with official duty and ministerial function to understand the worker with occupational disease to the fraudulent enterprise risk management scheme. For the industry, insurance and law firm elements of the enterprise the benefit of this corrupt means is an effective and ongoing fraudulent scheme or artifice to defraud, as per § 1346. --- to deprive (the West Virginia Worker) of the intangible right of honest services.

This scheme development of an ideology to corrupt the democratic process of government to protect the rights of the worker and citizens within the community secured by occupational safety and health law and public health law by acts of corruption by the Governor of West Virginia and the State Attorney General.

**Motivation**

To named and un-named industry, the limiting of economic liability that is defined by the potential and actual cost of work place occupational disease, and the economic and moral liability that is defined by the cost of environmental disease.

To named and un-named insurance, the limiting of payment for the same.

To named and un-named law firms, advantage in representing against the same.

To named and un-named physician public officials, the power to influence medicine as furthered by enterprise resources, money and other pecuniary benefits in return for faithfully furthering the enterprise risk management scheme.

8

To named Government the political realization of the ideology "West Virginia - Open for Business".

**Opportunity**

This action will define the fact of the named physician appointed public officials of this action to their willful and systematic corruption to the fraudulent scheme of enterprise risk management by the named and un-named industry, insurance and law firms to this action.

The unchecked influence of the named industry, insurance company, and law firms with collusion by the Office of the Governor made the legal power and ministerial functions of these physician public officials the corrupt instrument of these special interests.

The statutory duty of the named physician members enterprise scheme was to medical risk management; to the reliable application of accepted principles of medical science, including toxicology and medical biochemistry, to inform the worker, protect the worker and the public health, prevent injury and disease, recognize and report disease, and to further the lawful purpose of occupational safety and health law, Compensation law and public health law.

These physician public officials corrupted their duty to lawful medical risk management to further the means of the enterprise risk management scheme.

Opportunity for this scheme includes the federal rules of evidence post the "Daubert Decision" in which a blueprint was interpreted by the legal and medical elements of the enterprise for the control of medicine, as such control was empowered by West Virginia State statute to the medical element within the WVWCC to the enterprise scheme.

9

Gubernatorial administrations, finishing with Gov. Manchin, were dependant on the executive branch corruption of West Virginia Workers Compensation to the means of the enterprise scheme to realize the political end of the real or percieved "saving workers compensation".

The enterprise risk management scheme continues by the ongoing acts of the illegal means of the enterprise.

**The conspiratorial nature of the enterprise**
**Means by corruption of physician public officials**
The means of the enterprise is defined by a pattern of illegal acts committed by corrupt physician public officials to the interest of the named and un-named industry, insurance and law firm interests to the enterprise scheme.

The means of the enterprise is defined by the illegal acts of the corrupting industry, insurance and law firm members of the enterprise to the enterprise scheme.

These acts were willfully committed to aid the unlawful enterprise risk management scheme. These acts define the conspiratorial nature of the enterprise.

Means of this scheme was dependant on the blanket corruption of the physicians appointed as public officials within the former WVWCC as to the ministerial functions of these physicians as per WVC §6B-1-3. (f) as such ministerial function related to advantage for unlawful enterprise purpose. Enterprise control of physicians within the Commissions Office of Medical Services corrupted the ministerial function of these physicians to further enterprise purpose by concealment of occupational toxicants and the evidence of occupational disease claims by systematic rejection of these claims.

10

Such acts as willfully committed by named physician defendants including
Ranavaya MD, Doyle MD and Martin MD.

Means of this scheme included the blanket corruption of the statutory duty of
these physician appointed public officials to "define and control medicine" in
West Virginia as such named and un-named physicians appointed as public
officials to the Commissions Health Care Advisory Panel influenced the states
development guidelines as per W. Va. Code § 23-4-3b which state that the
Health Care Advisory Panel shall:

(a) *Establish guidelines for the health care which is reasonably required for the
treatment of the various types of injuries and **occupational diseases** within
the meaning of section three [23-4-3] of this article.*

(b) *Establish protocols and procedures for the performance of examinations or
evaluations performed by physicians or medical examiners pursuant to
sections seven-a and eight [23-4-7a and 23-4-8] of this article.*

(e) *Assist the commissioner in establishing appropriate professional review of
requests by health care providers to exceed the guidelines for the treatment
of injuries and **occupational diseases** established pursuant to subsection (a)
of this section.*

Where such lawful guidelines would include the reliable application of accepted
medical principles for the development of medical evaluation and treatment of
occupational disease influenced by occupational toxicant exposure. The
corruption of the physician public officials appointed to form these guidelines ,
and the corruption of the guidelines, form a pattern of acts to further the purpose
of the enterprise.

11

In spite of great effort by Plaintiff to assure HCAP duty to formation of these guidelines, these statutory medical evaluation and treatment guidelines for occupational illness and disease influenced by occupational toxicants **do not exist.**

Named physician public officials who served on the Health Care Advisory Panel (HCAP) include **Becker MD, Martin MD, Doyle MD** and **Caraway MD**.

**Means by fraudulent guideline associations**
Means of this scheme included the enterprise formation of the national **"Work Loss Data Institute"** with the self proclaimed purpose to develop medical evaluation and treatment guidelines, and disability duration guidelines based on the "federal rules of evidence".

The internet site for Work Loss Data Institute publishes this "Company Overview":

*Work Loss Data Institute (WLDI is an independent database development company focused on workplace health and productivity. Founded by Phil Denniston and Patricia Whelan (pictured above) in 1995, WLDI outlined its mission: To create, maintain and market information databases to implement standards for managing workforce productivity based on strict principals of **evidence-based** methodology, with ongoing focus on healthcare cost containment.*

*Over the last decade, WLDI has indeed raised the bar with Official Disability Guidelines, instilling accountability and achievement in the development and presentation of disability duration guidelines and benchmarking data on time away from work. The same can now be said for medical treatment guidelines in workers' compensation with the 2003 release of ODG Treatment in Workers' Comp. By adhering to self-imposed standards of evidence-based methodology*

12

*and customer-inspired product improvement, at WLDI progress is embraced like
an anthem. A three-prolonged annual update process is literally in continuous
operation, based on scientific medical literature review, survey data analysis,
and expert panel validation. As a result, the ODG product line has quickly
become the trusted authority on expected duration and appropriate utilization in
today' workers' comp and non-occupational disability markets. Over 30,000 of
the world's best and brightest (employers, insurers, TPA's, independent treating
physicians, allied healthcare providers and state & federal authorities) would
agree. The tools provided in ODG allow for a safe, smooth and expedited
return-to-work following illness or injury claims with appropriate, cost-effective
medical care. Perhaps the greatest benefactor is the injured worker, restored to
functional capacity and returned to the activity of life.*

To Work Loss Data Institute (WLDI) six named and un-named West Virginia
physician public officials became members of the Institutes Editorial Advisory
Board. For these physicians, recruitment to WLDI furthered their West Virginia
state statutory authority to form medical endical evaluation and treatment
guidelines. WLDI offered to these physicians the pecuniary benefit of
professional prominence in the defining of medicine for the nation.

Through such means, the enterprise controls the same.

Of six West Virginia state physician public officials to serve on the Work Loss
Data Institute Editorial Board, three physicians named in this action include
Ranavaya MD, Becker MD and Martin MD.

Means of this scheme includes the aggressive exploitation of the "federal rules
of evidence" by Work Loss Data Institute (WLDI) to the contrivance of medical
evaluation and treatment guidelines to the enterprise interpretation of the
"federal rules of evidence".

13

Example of this exploitation of federal rules of evidence is this WLDI internet site marketing of "Official Disability Guidelines" (ODG) as a product of Work Loss Data Institute. Of the ODG the following is stated "---*the first and only evidence-based reference for disability duration. ODG's Best Practice & Summary Guidelines are based on national norms reported to CDC and OSHA, representing over 3 million cases described as 'the most direct form of evidence that can be offered in court under the Federal Rules of Evidence.* "

Example of this exploitation of federal rules of evidence is this WLDI internet site marketing of *The "US Government documented return-to-work "norms" for every illness or injury."* As a product of WLDI the following is stated. *"The Survey of Occupational Injuries and Illnesses is a Federal/State program in which employer's reports are collected annually from about 176,000 private industry establishments and processed by State agencies cooperating with the Bureau of Labor Statistics. Summary info on the number of injuries and illnesses is copied by these employers directly from record keeping logs to the survey questionnaire. The questionnaire also asks for the number of employee hours worked (needed in the calculation of incidence rates) as well as its average employment (needed to verify the unit's employment-size class)."*

Example of this exploitation of federal rules of evidence in the production of a product by WLDI is the advisory board researching themselves --- *"At the request of clients (themselves), we are drilling down into major databases, the CDC and Prevention's National Health Interview Survey and OSHA's Survey of Occupational Illness & Injury from BLS OSHA Form 200, to obtain decision-making information on key issues affecting return-to-work in disability and workers' compensation."*,

Further example of this exploitation of product to federal rules of evidence is this WLDI internet statement *"---, Work-Loss Data Institute established an Editorial Advisory Panel consisting of medical directors from some of the largest employers in the country, and "Best Practice" Guidelines were added.*

14

*Each year, ODG editorial board members review and assess the most recently reported government data in conjunction with their own field experience. Their consensus forms the basis of the "Best Practice" guidelines. The guidelines consider the demands of the job and the type of therapy and recommend reasonable and attainable return-to-work goals in an optimally managed environment."*

Means of the enterprise is the marketing of medical guideline products based in part on industry self reporting of injury and illness statistics as "national norms".

The Mine Safety Health Administration Hazardous Communication Rule comments as to the reliability of the principle of such surveys in the notes section of the rule " (Begin Exhibit 2002 06-21*) Reporting injuries and illnesses. Lack of knowledge about chronic health effects associated with chemical exposures contributes to the under-reporting of occupational illnesses. Employers, such as mine operators, and doctors often lack information to link occupational illnesses with exposures to chemical hazards. Symptoms of chemically related, chronic, occupational illnesses are often treated without realizing that the cause is an occupational exposure. The Bureau of Labor Statistics (BLS) made note of this reporting disparity in one of their annual reports, 2*

*\* \* \* \* Some conditions (e.g., long term latent illnesses caused by exposure to carcinogens) are often difficult to link to the workplace and, therefore, may not be recognized and reported. Because of this, these long-term latent illnesses are believed to be understated in the survey's illness measures. \* \* \* \** (End Exhibit)

Means of the enterprise includes WLDI Editorial Board Members reviewing and assessing "government data in conjunction with their own field experiences" with their "consensus" forming the basis of "Best Practice" guidelines as a fraudulent product from WLDI to further the enterprise risk management scheme.

15

WLDI evidence based guidelines are the consensus based guidelines of the Editorial Advisory Board prejudiced to the purpose of its industry and insurance members and clients.

Means of the enterprise include the participation of six West Virginia Workers Compensation physicians in appointed positions of public trust sitting on the WLDI Editorial Advisory Board in conflict of interest to this board while holding public trust to the West Virginia worker.

Defendants Ranavaya MD, Becker MD and Martin MD aided and abetted the formation of guidelines from WLDI to fraudulently omit medical evaluation and treatment guidelines by numerous and ongoing acts to suppress the evidence of the West Virginia worker and further the concealment of occupational toxicant health hazards in West Virginia.

**Means by fraudulent medical certification board**

Means of this scheme included the enterprise formation of a fraudulent national medical specialty board to certify physicians to the medical guidelines formed by the Work Loss Data Institute. This specialty board is the American Board of Independent Medical Examiners (the ABIME).

The ABIME Internet Site states "*In 1993 specific steps were undertaken to develop a certification body, and in 1994 the American Board of Independent Medical Examiners was incorporated in Washington, D.C. **ABIME** is an organization independent of existing specialty and training organizations established to facilitate the development of an independent and high quality certification process. **ABIME** will interface cooperatively with other organizations and will not favor any specific group or specialty.*"

The American Board of Independent Medical Examiners (ABIME) lists numerous West Virginia Workers Compensation physician public appointees and employees. For example, Ranavaya MD is a former acting medical director

16

of the West Virginia Workers Compensation and is a "founding father" of the ABIME.

Ranavaya MD is listed as a recurrent president of the ABIME and Editor in Chief of the official periodical of the ABIME named Disability Medicine.

To the ABIME "*not favoring any specific group or specialty*", is this article entitled <u>Evidence Based Disability Duration Guidelines</u> written by Ranavaya MD as Editor in Chief of Disability Medicine Vol2 N03 June-Sept 2002. At this time, Ranavaya MD is also a Work Loss Data Institute Editor to the Official Disability Guidelines--- *"With the availability of evidence-based guidelines from Official Disability Guidelines, the tug-of-war in the return to work process is beginning to vanish." "Gone are the days when manipulators and puppeteers can graffiti the wall of this conscious and reputable institution with the filth of self-servitude. The industry is embracing Official Disability Guidelines from Work Loss Data Institute as it meets alone the stringent criteria for "evidence-based" medicine, and walks hand in hand with the silhouetted occupational doctor of tomorrow."*

By evidence based, defendant Dr. Ranavaya means legally defensible, In this same article Dr Ranavaya states "*The industry migration speaks clearly, and the demand is for credible, experience, normative data as a fundamental ingredient to the construction of return to work guidelines. To an occupational physician measuring time away from work, while each patient is always more important than the norms, the norms are more important than anything else*."

Ranavaya MD, Becker MD and Randal Short DO served the ABIME while in active appointed positions of public trust to the West Virginia Worker.

17

Ranavaya MD and Becker MD served the ABIME while they were concurrently members of the WLDI Editorial Review Board constructing the products of WLDI.

Products based on surveys the reliability of which is questioned by the BLS, and the consensus of Editorial Advisory Board members which includes named defendants **Ranavaya MD, Becker MD** and **Martin MD.**

The ABIME furthers the fraudulent purpose of maintaining the Independent Medical Examiner as dependant to the fraudulent guidelines of WLDI.

**Means by fraudulent The Rule 20 guidelines.**

Prior to the privatization of the Workers Compensation Commission, the commissions physician public officials in a final act had the commissions rule 20 medical evaluation and treatment guidelines legally transferred to the West Virginia Insurance Commission.

The rule 20 guidelines omit any real evaluation or treatment guideline for non-dust occupational disease. This guideline, with the "effect of law", incorporates the language that for any Independent Medical Examination to be paid by a compensation carrier, the physician performing the examination must be certified by the appropriate certifying board, which would be the ABIME.

As such guidelines were the duty of the physician public officials serving with statutory duty to the formation of these guidelines, and as this group served with or formed the only certifying board for independent medical examiners being the ABIME, then the act of these guidelines upon the privatization of West Virginia Workers Compensation is as law an ongoing means of the enterprise risk management scheme to further the enterprise risk management scheme.

Independent medical examinations in West Virginia favor industry and insurance interest, and favor the advantage of enterprise law firms representing these claims.

**Means by Fraudulent Concealment**

Through the 1990s and up until the privatization of the State compensation system in West Virginia beginning about January 2006, these physicians acted as per WVC §6B-1-3. (f) in the performance of *"Ministerial functions" mean(ing) actions or functions performed by an individual under a given state of facts in a prescribed manner in accordance with a mandate of legal authority, without regard to, or without the exercise of, the individual's own judgment as to the propriety of the action being taken"* to the medical management of the west Virginia worker.

Ministerial functions of some of these physicians included disability determination as criticized in a report titled *Full Performance Evaluation of the Workers' Compensation Division Interdisciplinary Examination Board* by the states Office of Legislative Auditor dated January 1999; ---*"requiring the IEB to make referrals to members' practices creates an unfavorable incentive structure and invites abuse"* ---*"Functioning as a quality control mechanism as claimants reach the IEB and, at the same time, serving as IMEs permits members to have incompatible duties."*---*'Bias in an examiner is an inherent risk while performing these examinations and self-scrutiny is required to prevent or minimize it."*---*"There is a tendency to identify with the referring sources who may subtly pressure for a favorable opinion'.*

Ministerial functions of these physicians individually and as a group in aiding and abetting the common purpose of the enterprise risk management scheme included review of occupational disease claims for admissibility to the Commission, as exampled by this statement by Mr. Brannon, an attorney employed by defendant Bowles Rice McDavid Graff & Love, stated in

19

deposition before Administrative Judge Campbell in the case of Griffith vs. Eastern Associated Coal Corp on June 14th, 2004 about the behavior of defendant Ranavaya MD *"---Dr. Ranavaya was a contributing author to the Disability Guidelines. Presley Reed actually wrote the Presley Reed Guidelines. Dr Ranavaya is an occupational medical expert, who works not only for the Commission itself in these claims, but "---"Dr. Ranavaya is certainly hired by myself, and other individuals, to perform independent medical examinations".*

Other-than this Office of Legislative Auditor report from 1999, there is no evidence that the named physician public officials answered to any authority other than to itself.

The named physician public officials enriched themselves in return for acts to conceal occupational toxicant hazards, and acts to conceal toxicant related occupational disease as fraudulent means of the enterprise scheme.

Such acts include the denial of worker compensation claims through the "ministerial" function of these physician public officials such that the evidence of these workers was concealed, while concurrently receiving from industry, insurance and law firm special interests payment of fees or other pecuniary benefit from same to influence the physician public employee to deny the worker claim.

The medical evaluation guidelines produced by these physician public officials serving on the Commissions Health Care Advisory Panel, including the current rule 20 guidelines, is a scheme or artifice to defraud; to deprive the West Virginia worker of the intangible right of honest services, as a corrupt instrument of the enterprise, that servers to conceal occupational disease influenced by toxicant health hazards.