IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY DIVISION
**Amended Complaint**

FILED

AUG - 2 2007

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

Michael Merritt Kostenko

Plaintiff,

v.                                          Case # 5:07-0462

1. Governor Joe Manchin

2. State Attorney General Darrell McGraw

3. Mohammad Ranavaya MD

4. James Becker MD

5. Chris Martin MD

6. Doyle MD

7. Caraway MD

8. Short DO

9. The American Board of Independent Medical Examiners

10. Greg Burton

11. Obrokta Jr. JD

12. Brickstreet

13. Wells Fargo

14. Bowles, Rice, McFadden, Graff and Love

15. Bob Kiss

16. Jackson Kelly

17. Massy Coal

18. Peabody Coal

19. Eastern Associated Coal

20. National Institute for Chemical Studies

21. Chemical Alliance Zone

22. West Virginia Manufactures Association

Defendants

# Index

| | |
|---|---|
| Page 1 | Preface to a complicated civil RICO case |
| Page 2 | Jurisdiction and Venue |
| Page 3 | Plaintiff |
| Page 3 | Defendants |
| Page 4 | Nature of the Case |
| Page 5 | Defendants to the Enterprise |
| Page 9 | The Enterprise Risk Management Scheme |
| Page 12 | The Conspiratorial Nature of the Enterprise |
| Page 26 | The Enterprise Scheme to Plaintiff |
| Page 84 | Pattern of Racketeering Activity |
| Page 84 | I Predicate Evidence to the Claim of Extortion Under Color of Official Right-Notice of Termination |
| Page 85 | Motivation and Opportunity of Enterprise Risk Management Scheme |
| Page 86 | Perceived Pressure and Opportunity of Enterprise to Act against Plaintiff |
| Page 87 | Ethical Rules Violated to the Scheme |
| Page 90 | Predicate Acts to Termination |
| Page 110 | Predicate Evidence Post Termination Decision |
| Page 116 | Defendant Physician Knowing of Wrongdoing |
| Page 118 | Defendant Benefit from Termination Decision |
| Page 123 | II Predicate Evidence to the Claim of Extortion under Color of Official Right-Occupational Claims Denials |
| Page 141 | Benefit of Fraudulent Denial of Claims to Defendants |
| Page 145 | Predicate Evidence of West Virginia Government to further Enterprise Scheme |
| Page 149 | Perceived Pressure by Gov. Manchin to aid and abet Extortionate acts against Plaintiff |

Page 153                   Predicate Acts by Governor Manchin-Furthering (aiding and abetting) the fraudulent termination decision of Plaintiff

Page 155                   Predicate Evidence of the Rule 20 Medical Management of Claims as Extortionate means to Further Scheme- Governor

Page 157                   Predicate Evidence of Extortion under color of official right-the 5 and 15 day reports

Page 158                   Predicate Evidence of Extortion under Color of Official Right-the Gov. Adding an Abetting of Fraudulent Denial of Occupational Disease Claims

Page 159                   Predicate Acts by Governor Manchin to further enterprise risk management scheme-non-action when there was a duty to act

Page 161                   Predicate Acts to further Enterprise Scheme-Attorney General Darrell McGraw

Page 166                   Fraudulent Notice of Termination as an Extortionate Act under Color of Official Right by the State to Suppress Plaintiff as Means to Further Political End

Page 168                   Summery as 11 part Discussion

Page 182                   Damages

Page 185                   Counts

Page 190                   Relief

## Preface to a complicated civil RICO case

Webster's defines that evil is something that brings sorrow, distress or calamity, that evil is the fact of suffering, misfortune, and wrongdoing, that evil is morally reprehensible, that evil arises from actual or reputed bad character or conduct, that evil causes harm.

Webster's defines the evil-doer is one who does evil, that evil-doing is the act or action of doing evil.

The evil alleged by this action is banned or inhibited by social custom, emotional aversion,

Is banned or inhibited by the moral and ethical guides of the Nuremberg code, Helsinki declaration, and the Belmont Report,

Is banned or inhibited by the purpose of federal labor law in the Occupational Safety and health Act and the Mine Safety and Health Act,

Is banned or inhibited by federal Health and Human Resources law and purpose, West Virginia Public Health law, and the former West Virginia State Workers Compensation law.

The evil-doers use deceit and coercion in conspiracy, motivated by the financial liability of the harm, sorrow, suffering and calamity caused by their evil actions, motivated by the moral reprehensibility of their evil conduct, to fraudulently deny from and exclude from use, approach or mention, the object, word and act of their evil conduct.

Opportunity of conspiracy is afforded by the overwhelming economic power and the ideology of the conspirators, to corrupt and influence the democratic process, in violation of federal RICO purpose and law, as Congressional statement of findings and purpose Section 1 of Pub. L. 91-452 provides in part that: *"The Congress finds that (1) organized crime in the United-States is a highly sophisticated, diversified, and widespread activity*

*that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and corruption; (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors ---, and other forms of **social exploitation**; (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and **corrupt our democratic processes**; (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with "free competition, seriously **burden interstate and foreign commerce,** threaten the domestic security, and **undermine the general welfare of the Nation and its citizens**; and (5) organized crime activities in the United States continues to grow because of defects in the evidence-gathering process of the law inhibiting the development of the legally admissible evidence necessary to bring criminal and other sanctions or remedies to bear on the unlawful activities of those engaged in organized crime and because the sanctions and remedies available to the Government are unnecessarily limited in scope and impact.*

This action is a civil claim that must argue and define what may be otherwise a complex criminal enterprise.

Plaintiff at this time brings this action on behalf of him-self due to the lack of finding an interested, confident and experienced attorney to represent this claim.

## JURISDICTION AND VENUE

This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § § 1961, 1962, 1964, 15 U.S.C. § 1 *et seq.*, and 28 U.S.C. § § 1331, 1337 and 1367. The Court has personal jurisdiction over the defendants pursuant to 18 U.S.C. § § 1965(b) and (d).

Venue is proper in this district pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b).

## Plaintiff

Dr. Kostenko is an osteopathic physician licensed to practice in West Virginia, with business address at 3050 C&O Dam Road, Daniels WV 25832.

Dr. Kostenko had been a provider of medical evaluation and treatment services through the West Virginia State Worker Compensation Commission from about 1990 until February 10th 2005.

## Defendants

The enterprise is comprised of "persons" within the meaning of U.S.C. §18, 1961(3) with individuals, partnerships, corporations and associations in union associated in fact although not a single legal entity as an "enterprise" defined by U.S.C. §18, 1961(4).

The defendants are "persons" who have willfully committed a "pattern of racketeering activity" within the meaning of U.S.C. §18, 1961(5).

With respect to the overt acts and activities alleged herein, each Defendant conspired with each other and with others not named as Defendants in this Complaint to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

**West Virginia State Government Public Officials**

> Governor Joe Manchin
>
> State Attorney General Darrell McGraw

**Medical element individual members**

> Mohammad Ranavaya MD
>
> James Becker MD
>
> Chris Martin MD
>
> Doyle MD
>
> Caraway MD
>
> Short DO

**Medical association members**

The American Board of Independent Medical Examiners

**Insurance element individual members**

Greg Burton

Obrokta Jr. JD

**Insurance element corporate members**

Brickstreet

Wells Fargo

**Law Firm element member**

Bowles, Rice, McFadden, Graff and Love

Bob Kiss

Jackson Kelly

**Industry**

Massy Coal

Peabody Coal

Eastern Associated Coal

National Institute for Chemical Studies

Chemical Alliance Zone

West Virginia Manufactures Association

**Persons who are as yet unnamed members of the enterprise**

**<u>Nature of the case</u>**

Plaintiff has been and continues to be damaged by Defendants numerous and continuous acts of extortion under color of official right in violation of USC 1951 as defined under USC 1961 by Defendants to further the common purpose and unlawful means of RICO enterprise.

Defendants act in collusion to aid and abet a common scheme, hence forth the enterprise risk management scheme, the purpose of which is to control the economic and moral liability of occupational and environmental disease caused by or influenced by known toxicants inherent to modern industrial development and flowing to the worker and the

environment, by the unlawful means of concealment of the toxicants and concealment of the evidence of workers with evidence of occupational disease caused by or influenced by industrial toxicants,

West Virginia State Governor Manchin in dependant on the unlawful means of the enterprise risk management scheme exposed by Plaintiff to realize political ends.

Plaintiff has exposed this enterprise risk management scheme to the state with the response by the state to further the purpose of the enterprise by acts to destroy the professional practice of Plaintiff.

## Defendants to the Enterprise

This action groups the defendants into four elements of the RICO enterprise. These are the medical, insurance, industry and law firm elements. The named Government Defendants further the enterprise scheme as means to political ends.

The medical element is composed of two principle components. The individual physicians who served as appointed public officials and employees within the former West Virginia State Workers Compensation Commission and the named medical associations.

The named and un-named physicians to this action are Physicians who were appointed or otherwise employed by the Compensation Commissioner as public officials within the former West Virginia Workers Compensation Commission. The physician public officials as employees of the state held duty of ministerial function over the claims submitted by workers to workers compensation and lawful duty to understand and construct evaluation guidelines to further the understanding of the West Virginia Worker.

Duty of ministerial function by these physicians within the Commissions Office of Medical Services to determine the admissibility of worker claims for occupational disease. Duty defined by statute for these physicians to form medical evaluation

guidelines, medical treatment guidelines, and disability duration guidelines per W. Va. Code § 23-4-3b. (a),(b),(e).

These physicians were, as a group, empowered by the legal authority of the State of West Virginia to control medicine and the medical understanding of the West Virginia worker.

The Defendant physicians ethically and unlawfully breached their collective duty to the state and the worker as means to further the enterprise risk management scheme.

The enterprise recruited these physician public officials into the fraudulent medical organizations to further the means of the scheme.

Work Loss Data Institute (WLDI), a fraudulent enterprise organization, exists to form medical evaluation, treatment and disability duration guidelines, recruited six West Virginia physician public officials to further the unlawful enterprise means to enterprise purpose in West Virginia.

The American Board of Independent Medical Examiners (ABIME), a fraudulent enterprise organization, exists to certify Independent Medical Examiners to WLDI evaluation, treatment and disability duration guidelines and was "co-founded" by a West Virginia physician public official while the ABIME recruited numerous West Virginia physician public officials with influence within the state to prestigious advisory board positions. The ABIME controls the practice of the Independent Medical Examiner. In West Virginia by means of the fraudulent Rule 20 Medical Management of Claims the ABIME certified Independent Medical Examiner is solely recognized by the state as credible.

The enterprise physician and the enterprise guidelines, including the Rule 20 Medical Management of Claims, are the fraudulent means of the enterprise control of medicine to further the enterprise risk management scheme.

**Industry**

The named Industries to this action are companies and organizations of industry and law that further the unlawful means and purpose of the enterprise.

This industry, and unnamed industry, is involved with modern industrial development in West Virginia, particularly mining and processing of coal. Such mining activity is notoriously contentious in its impact of occupational coal dust disease to the coal miner, as evidenced by common history and the reality of federal pneumoconiosis programs.

This Industry is of paramount importance for the commerce of the country as defined by Congress in the Mine Safety and Health Act.

Whereas injury is assumed to heal, occupational disease tends to be chronic and progressive. Occupational disease, other than pneumoconiosis inherent to the Coal Mining industry, includes disease influenced by worker exposure to welding fumes, organic solvents, coal preparation plant chemicals, kiln dust treatments of coal refuse piles, chemical belt splicing solvents, float-sink testing solvents and long wall emulsion. The hazardous nature of the agents inherent to this work have been defined by the agencies with lawful authority to define such under the Mine Safety and Health Act and the Occupational Safety and Health Act. The toxicant hazards inherent to these industries are well defined and not an issue to this claim.

It is the recognition of and both real and potential liability to industry of occupational disease influenced by worker exposure to known chemical "toxicant" hazards inherent to this industry, and the cost of occupational disease flowing from such, is the interest of the Industry element to the enterprise.

The organizations of industry and law further the unlawful means and purpose of the enterprise and include the National Institute for Chemical Studies (NICS), the Chemical Alliance Zone (CAZ) and the West Virginia Manufactures Association. The

7

organizations define the political ideology and means to influence the state to the common purpose of the enterprise.

**Insurance**

The named individual members to the enterprise include the former Executive director of the West Virginia Workers Compensation Commission, Greg Burton and chief legal council to the former commission, Obrokta Jr. JD.

Burton and Obrokta Jr. JD furthered acts of extortion under color of official right to destroy the opposition of Plaintiff to the unare now President and Vice President of BrickStreet, the privatized employers mutual insurance company that was the former West Virginia State Workers Compensation.

The named insurance industry members are BrickStreet and Wells Fargo. Wells Fargo on its internet site claims to by the largest business insurer in the country, and owns Acordia that has been a principle "third party administrator" of workers compensation claims in West Virginia. Parent Company Wells Fargo has assumed the third party workers compensation insurance coverage of Acordia.

**Law Firms**

Bowles Rice McDavid Graff & Love PLLC and Jackson Kelly are the named law firm members of the enterprise.

These law firms are principle in exploiting the means of the enterprise risk management scheme to represent the legal interest of Industry in concealing occupational toxicant hazards and concealing the evidence of occupational disease by fraudulent denial of workers compensation claims.

These law firms are principle in politicizing the enterprise scheme as political ideology to subvert the democratic process and the interest of the state as the purpose of the

enterprise with the state dependant on the success of the fraudulent enterprise risk management scheme.

## West Virginia State Government

The Office of the Governor and the Office of the State Attorney General have assumed the purpose of the enterprise as political ideology for personal and political benefit.

Governor Manchin and the office of the Governor aid and abet the unlawful and fraudulent means of the enterprise risk management scheme as means to realize the political end of "saving workers compensation".

Attorney General McGraw and the office of the Attorney General aid and abet the unlawful and fraudulent means of the enterprise risk management scheme to further the political ends of the Governor, and for personal benefit.

## The Enterprise Risk Management Scheme.

The common and un-lawful purpose of the enterprise is to limit the cost of occupational disease and environmental disease by the fraudulent concealment of occupational toxicant hazards inherent to industry in West Virginia, and the fraudulent concealment of the evidence of worker occupational disease.

This enterprise risk management scheme hinders commerce as defined by congress by purpose of federal Occupational Health and Safety law protecting the worker. This enterprise risk management scheme hinders the lawful medical risk management of the West Virginia worker as per former West Virginia Workers Compensation Commission statute, and the purpose of the Industrial Council that now administrates these issues within the state Insurance Commission.

The means of the enterprise scheme requires the ongoing corruption of medicine with official duty and ministerial function to understand the worker with occupational disease to the fraudulent enterprise risk management scheme. For the industry, insurance and law

9

firm elements of the enterprise the benefit of this corrupt means is an effective and ongoing fraudulent scheme or artifice to defraud, as per § 1346. --- to deprive (the West Virginia Worker) of the intangible right of honest services in violation of rights secured under Occupational Safety and Health Law in violation of § 241 Conspiracy against rights and § 242 Deprivation of rights under color of law.

The enterprise risk management scheme developed a political ideology to corrupt the democratic process of government to protect the rights of the worker and the citizen secured by Occupational Safety and Health Law and Public Health Law by acts of corruption by the Governor of West Virginia and the State Attorney General.

**Motivation**

To named and un-named industry, the limiting of economic liability that is defined by the potential and actual cost of work place occupational disease, and the economic and moral liability that is defined by the cost of environmental disease.

To named and un-named insurance, the limiting of payment for the same.

To named and un-named law firms, advantage in representing against the same.

To named and un-named physician public officials control over medicine as furthered by enterprise power and pecuniary benefit for faithfully furthering the enterprise risk management scheme.

To named Government the realization of the political ideology of "saving Worker Compensation" and making "West Virginia -Open for Business".

**Opportunity**

This action will define the fact of the named physician appointed public officials of this action to their willful and systematic corruption to the fraudulent scheme of enterprise

risk management by the named and un-named industry, insurance and law firms to this action.

The unchecked influence of the named industry, insurance company, and law firms with collusion by the Office of the Governor made the legal power and ministerial functions of these physician public officials the corrupt means of the enterprise risk management scheme.

The statutory duty of the named physician members enterprise scheme was to medical risk management; to the reliable application of accepted principles of medical science, including toxicology and medical biochemistry, to inform the worker, protect the worker and the public health, prevent injury and disease, recognize and report disease, and to further the lawful purpose of occupational safety and health law, Compensation law and public health law.

These physician public officials corrupted their duty to lawful medical risk management to further the means of the enterprise risk management scheme.

Opportunity for this scheme includes the federal rules of evidence following the federal court "Daubert Decision" in which a blueprint was interpreted by the legal and medical elements of the enterprise for the fraudulent control of medicine.

Gubernatorial administrations, finishing with Gov. Manchin, are dependant on the executive branch corruption of West Virginia Workers Compensation to the means of the enterprise scheme to realize the political end of the real or perceived "saving workers compensation".

### The conspiratorial nature of the enterprise
### Means by corruption of physician public officials

The exposure of corrupt physician public officials and fraudulent official medical evaluation guidelines by Plaintiff was motivation for enterprise acts to hinder and destroy Plaintiff.

The means of the enterprise is defined by a pattern of illegal acts committed by corrupt physician public officials to the interest of the named and un-named industry, insurance and law firm interests to the enterprise scheme.

The means of the enterprise is defined by the illegal acts of the corrupting industry, insurance and law firm members of the enterprise to further the enterprise scheme.

These acts were willfully committed to aid the unlawful enterprise risk management scheme. These acts define the conspiratorial nature of the enterprise.

Means of this scheme was dependant on the blanket corruption of the physicians appointed as public officials within the former WVWCC as to the ministerial functions of these physicians as per WVC §6B-1-3. (f) as such ministerial function related to advantage for unlawful enterprise purpose. Enterprise control of physicians within the Commissions Office of Medical Services corrupted the ministerial function of these physicians to further enterprise purpose by concealment of occupational toxicants and the evidence of occupational disease claims by systematic rejection of these claims.

Such acts as willfully committed by named physician defendants including Ranavaya MD, Doyle MD and Martin MD.

Means of this scheme included the blanket corruption of the statutory duty of these physician appointed public officials to "define and control medicine" in West Virginia as such named and un-named physicians appointed as public officials to the Commissions

Health Care Advisory Panel influenced the states development guidelines as per W. Va. Code § 23-4-3b which state that the Health Care Advisory Panel shall:

*(a)     Establish guidelines for the health care which is reasonably required for the treatment of the various types of injuries and **occupational diseases** within the meaning of section three [23-4-3] of this article.*

*Establish protocols and procedures for the performance of examinations or evaluations performed by physicians or medical examiners pursuant to sections seven-a and eight [23-4-7a and 23-4-8] of this article.*

*Assist the commissioner in establishing appropriate professional review of    requests by health care providers to exceed the guidelines for the treatment of injuries and **occupational diseases** established pursuant to subsection (a) of this section.*

Where such lawful guidelines would include the reliable application of accepted medical principles for the development of medical evaluation and treatment of occupational disease influenced by occupational toxicant exposure. The corruption of the physician public officials appointed to form these guidelines , and the corruption of the guidelines, form a pattern of acts to further the purpose of the enterprise.

In spite of great effort by Plaintiff to assure HCAP duty to formation of these guidelines, these statutory medical evaluation and treatment guidelines for occupational illness and disease influenced by occupational toxicants **do not exist.**

Named physician public officials who served on the Health Care Advisory Panel (HCAP) include **Becker MD, Martin MD, Doyle MD** and **Caraway MD.**

**Means by fraudulent guideline associations**

Means of this scheme included the enterprise formation of the national **"Work Loss Data Institute"** with the self proclaimed purpose to develop medical evaluation and

treatment guidelines, and disability duration guidelines based on the "federal rules of evidence".

The internet site for Work Loss Data Institute publishes this "Company Overview":

*Work Loss Data Institute (WLDI is an independent database development company focused on workplace health and productivity. Founded by Phil Denniston and Patricia Whelan (pictured above) in 1995, WLDI outlined its mission: To create, maintain and market information databases to implement standards for managing workforce productivity based on strict principals of **evidence-based** methodology, with ongoing focus on healthcare cost containment.*

*Over the last decade, WLDI has indeed raised the bar with Official Disability Guidelines, instilling accountability and achievement in the development and presentation of disability duration guidelines and benchmarking data on time away from work. The same can now be said for medical treatment guidelines in workers' compensation with the 2003 release of ODG Treatment in Workers' Comp. By adhering to self-imposed standards of evidence-based methodology and customer-inspired product improvement, at WLDI progress is embraced like an anthem. A three-prolonged annual update process is literally in continuous operation, based on scientific medical literature review, survey data analysis, and expert panel validation. As a result, the ODG product line has quickly become the trusted authority on expected duration and appropriate utilization in today' workers' comp and non-occupational disability markets. Over 30,000 of the world's best and brightest (employers, insurers, TPA's, independent treating physicians, allied healthcare providers and state & federal authorities) would agree. The tools provided in ODG allow for a safe, smooth and expedited return-to-work following illness or injury claims with appropriate, cost-effective medical care. Perhaps the greatest benefactor is the injured worker, restored to functional capacity and returned to the activity of life.*

To Work Loss Data Institute (WLDI) six named and un-named West Virginia physician public officials became members of the Institutes Editorial Advisory Board. For these

14

physicians, recruitment to WLDI furthered their West Virginia state statutory authority to form medical endical evaluation and treatment guidelines. WLDI offered to these physicians the pecuniary benefit of professional prominence in the defining of medicine for the nation.

Through such means, the enterprise controls the same.

Of six West Virginia state physician public officials to serve on the Work Loss Data Institute Editorial Board, three physicians named in this action include Ranavaya MD, Becker MD and Martin MD.

Means of this scheme includes the aggressive exploitation of the "federal rules of evidence" by Work Loss Data Institute (WLDI) to the contrivance of medical evaluation and treatment guidelines to the enterprise interpretation of the "federal rules of evidence".

Example of this exploitation of federal rules of evidence is this WLDI internet site marketing of "Official Disability Guidelines" (ODG) as a product of Work Loss Data Institute. Of the ODG the following is stated *"---the first and only evidence-based reference for disability duration. ODG's Best Practice & Summary Guidelines are based on national norms reported to CDC and OSHA, representing over 3 million cases described as 'the most direct form of evidence that can be offered in court under the Federal Rules of Evidence."*

Example of this exploitation of federal rules of evidence is this WLDI internet site marketing of *The "US Government documented return-to-work "norms" for every illness or injury."* As a product of WLDI the following is stated. *"The Survey of Occupational Injuries and Illnesses is a Federal/State program in which employer's reports are collected annually from about 176,000 private industry establishments and processed by State agencies cooperating with the Bureau of Labor Statistics. Summary info on the number of injuries and illnesses is copied by these employers directly from record keeping logs to the survey questionnaire. The questionnaire also asks for the number of*

*employee hours worked (needed in the calculation of incidence rates) as well as its*
*average employment (needed to verify the unit's employment-size class)."*

Example of this exploitation of federal rules of evidence in the production of a product by
WLDI is the advisory board researching themselves --- *"At the request of clients*
*(themselves), we are drilling down into major databases, the CDC and Prevention's*
*National Health Interview Survey and OSHA's Survey of Occupational Illness & Injury*
*from BLS OSHA Form 200, to obtain decision-making information on key issues affecting*
*return-to-work in disability and workers' compensation.",*

Further example of this exploitation of product to federal rules of evidence is this WLDI
internet statement *"---, Work-Loss Data Institute established an Editorial Advisory Panel*
*consisting of medical directors from some of the largest employers in the country, and*
*"Best Practice" Guidelines were added. Each year, ODG editorial board members*
*review and assess the most recently reported government data in conjunction with their*
*own field experience. Their consensus forms the basis of the "Best Practice" guidelines.*
*The guidelines consider the demands of the job and the type of therapy and recommend*
*reasonable and attainable return-to-work goals in an optimally managed environment."*

Means of the enterprise is the marketing of medical guideline products based in part on
industry self reporting of injury and illness statistics as "national norms".

The Mine Safety Health Administration Hazardous Communication Rule comments as to
the reliability of the principle of such surveys in the notes section of the rule " (Begin
Exhibit 2002 06-21*) **Reporting injuries and illnesses.** Lack of knowledge about chronic*
*health effects associated with chemical exposures contributes to the under-reporting of*
*occupational illnesses. Employers, such as mine operators, and doctors often lack*
*information to link occupational illnesses with exposures to chemical hazards. Symptoms*
*of chemically related, chronic, occupational illnesses are often treated without realizing*
*that the cause is an occupational exposure. The Bureau of Labor Statistics (BLS) made*
*note of this reporting disparity in one of their annual reports, 2*

*\* \* \* \* Some conditions (e.g., long term latent illnesses caused by exposure to carcinogens) are often difficult to link to the workplace and, therefore, may not be recognized and reported. Because of this, these long-term latent illnesses are believed to be understated in the survey's illness measures.* \* \* \* \* (End Exhibit)

Means of the enterprise includes WLDI Editorial Board Members reviewing and assessing "government data in conjunction with their own field experiences" with their "consensus" forming the basis of "Best Practice" guidelines as a fraudulent product from WLDI to further the enterprise risk management scheme.

WLDI evidence based guidelines are the consensus based guidelines of the Editorial Advisory Board prejudiced to the purpose of its industry and insurance members and clients.

Means of the enterprise include the participation of six West Virginia Workers Compensation physicians in appointed positions of public trust sitting on the WLDI Editorial Advisory Board in conflict of interest to this board while holding public trust to the West Virginia worker.

Defendants Ranavaya MD, Becker MD and Martin MD aided and abetted the formation of guidelines from WLDI to fraudulently omit medical evaluation and treatment guidelines by numerous and ongoing acts to suppress the evidence of the West Virginia worker and further the concealment of occupational toxicant health hazards in West Virginia.

### Means by fraudulent medical certification board
Means of this scheme included the enterprise formation of a fraudulent national medical specialty board to certify physicians to the medical guidelines formed by the Work Loss Data Institute. This specialty board is the American Board of Independent Medical Examiners (the ABIME).

The ABIME Internet Site states "*In 1993 specific steps were undertaken to develop a certification body, and in 1994 the American Board of Independent Medical Examiners was incorporated in Washington, D.C. **ABIME** is an organization independent of existing specialty and training organizations established to facilitate the development of an independent and high quality certification process. **ABIME** will interface cooperatively with other organizations and will not favor any specific group or specialty.*"

The American Board of Independent Medical Examiners (ABIME) lists numerous West Virginia Workers Compensation physician public appointees and employees. For example, Ranavaya MD is a former acting medical director of the West Virginia Workers Compensation and is a "founding father" of the ABIME.

Ranavaya MD is listed as a recurrent president of the ABIME and Editor in Chief of the official periodical of the ABIME named Disability Medicine.

To the ABIME "*not favoring any specific group or specialty*", is this article entitled Evidence Based Disability Duration Guidelines written by Ranavaya MD as Editor in Chief of Disability Medicine Vol2 N03 June-Sept 2002. At this time, Ranavaya MD is also a Work Loss Data Institute Editor to the Official Disability Guidelines--- "*With the availability of evidence-based guidelines from Official Disability Guidelines, the tug-of-war in the return to work process is beginning to vanish." "Gone are the days when manipulators and puppeteers can graffiti the wall of this conscious and reputable institution with the filth of self-servitude. The industry is embracing Official Disability Guidelines from Work Loss Data Institute as it meets alone the stringent criteria for "evidence-based" medicine, and walks hand in hand with the silhouetted occupational doctor of tomorrow.*"

By evidence based, defendant Dr. Ranavaya means legally defensible, In this same article Dr Ranavaya states "*The industry migration speaks clearly, and the demand is for credible, experience, normative data as a fundamental ingredient to the construction of return to work guidelines. To an occupational physician measuring time away from work,*

*while each patient is always more important than the norms, the norms are more important than anything else.*"

Ranavaya MD, Becker MD and Randal Short DO served the ABIME while in active appointed positions of public trust to the West Virginia Worker.

Ranavaya MD and Becker MD served the ABIME while they were concurrently members of the WLDI Editorial Review Board constructing the products of WLDI.

Products based on surveys the reliability of which is questioned by the BLS, and the consensus of Editorial Advisory Board members which includes named defendants **Ranavaya MD, Becker MD** and **Martin MD.**

The ABIME furthers the fraudulent purpose of maintaining the Independent Medical Examiner as dependant to the fraudulent guidelines of WLDI.

**Means by fraudulent The Rule 20 guidelines.**
Prior to the privatization of the Workers Compensation Commission, the commissions physician public officials in a final act had the commissions rule 20 medical evaluation and treatment guidelines legally transferred to the West Virginia Insurance Commission.

The rule 20 guidelines omit any real evaluation or treatment guideline for non-dust occupational disease. This guideline, with the "effect of law", incorporates the language that for any Independent Medical Examination to be paid by a compensation carrier, the physician performing the examination must be certified by the appropriate certifying board, which would be the ABIME.

As such guidelines were the duty of the physician public officials serving with statutory duty to the formation of these guidelines, and as this group served with or formed the only certifying board for independent medical examiners being the ABIME, then the act of these guidelines upon the privatization of West Virginia Workers Compensation is as

19

law an ongoing means of the enterprise risk management scheme to further the enterprise risk management scheme.

Independent medical examinations in West Virginia favor industry and insurance interest, and favor the advantage of enterprise law firms representing these claims.

**Means by Fraudulent Concealment**

Through the 1990s and up until the privatization of the State compensation system in West Virginia beginning about January 2006, these physicians acted as per WVC §6B-1-3. (f) in the performance of *"Ministerial functions" mean(ing) actions or functions performed by an individual under a given state of facts in a prescribed manner in accordance with a mandate of legal authority, without regard to, or without the exercise of, the individual's own judgment as to the propriety of the action being taken"* to the medical management of the west Virginia worker.

Ministerial functions of some of these physicians included disability determination as criticized in a report titled *Full Performance Evaluation of the Workers' Compensation Division Interdisciplinary Examination Board* by the states Office of Legislative Auditor dated January 1999; ---*"requiring the IEB to make referrals to members' practices creates an unfavorable incentive structure and invites abuse"* ---*"Functioning as a quality control mechanism as claimants reach the IEB and, at the same time, serving as IMEs permits members to have incompatible duties."*---*'Bias in an examiner is an inherent risk while performing these examinations and self-scrutiny is required to prevent or minimize it."*---*"There is a tendency to identify with the referring sources who may subtly pressure for a favorable opinion'.*

Ministerial functions of these physicians individually and as a group in aiding and abetting the common purpose of the enterprise risk management scheme included review of occupational disease claims for admissibility to the Commission, as exampled by this statement by Mr. Brannon, an attorney employed by defendant Bowles Rice McDavid Graff & Love, stated in deposition before Administrative Judge Campbell in the case of

Griffith vs. Eastern Associated Coal Corp on June 14th, 2004 about the behavior of defendant Ranavaya MD *"---Dr. Ranavaya was a contributing author to the Disability Guidelines. Presley Reed actually wrote the Presley Reed Guidelines. Dr Ranavaya is an occupational medical expert, who works not only for the Commission itself in these claims, but "---"Dr. Ranavaya is certainly hired by myself, and other individuals, to perform independent medical examinations"*.

Other-than this Office of Legislative Auditor report from 1999, there is no evidence that the named physician public officials answered to any authority other than to itself.

The named physician public officials enriched themselves in return for acts to conceal occupational toxicant hazards, and acts to conceal toxicant related occupational disease as fraudulent means of the enterprise scheme.

Such acts include the denial of worker compensation claims through the "ministerial" function of these physician public officials such that the evidence of these workers was concealed, while concurrently receiving from industry, insurance and law firm special interests payment of fees or other pecuniary benefit from same to influence the physician public employee to deny the worker claim.

The medical evaluation guidelines produced by these physician public officials serving on the Commissions Health Care Advisory Panel, including the current rule 20 guidelines, is a scheme or artifice to defraud; to deprive the West Virginia worker of the intangible right of honest services, as a corrupt instrument of the enterprise, that servers to conceal occupational disease influenced by toxicant health hazards.

These physician public officials aided and abetted the other members of the enterprise including the law firm member Bowels, Rice, McFadden, Graff and Love to the advantage of the common and unlawful enterprise risk management scheme.

These physician public officials were corrupt public officials who received pecuniary benefit from acts to further enterprise interest, including acts to hinder the "whistle blowing" activity of Plaintiff in attempting to expose this corrupt activity.

To the purpose of the enterprise risk management scheme, the physician public officials abused their duty as power to define medicine in violation of established medical principles. To this is the attempt to deny or corrupt the principle of chronic toxicity in medical evaluation guidelines as the reliable application of this principle in lawful medical evaluation guidelines is counter to the purpose of the enterprise scheme.

Evaluation Guidelines produced by these physician public officials fraudulently omit the principle of chronic toxicity.

Role 20 Medical Management of Claims as submitted by the Commissions Board of Managers chaired by Gov. Manchin omit medical evaluation and treatment guidelines, and omit the application of the medical principle of the disease of chronic toxicity.

Chronic toxicity is the principle to understand the disease process of occupational disease influenced by toxicants such as welding fumes, solvents, float-sink chemicals, de-militarization of ammunition, coal prep plant toxicants long wall emulsion etc.

This occupational disease is concealed by the means of the corrupt medicine element of the enterprise to the enterprise scheme and is conspicuously not reported in the "surveys" relied upon by WLDI to form evidence based guidelines.

The disease process of 'chronic toxicity' is a fundamental principle that is accepted within the discipline of medical toxicology. The principle of "chronic toxicity" allows the understanding of multiple causal or influencing factors and agents to the same disease process of "chronic toxicity" as defined by the physiologic and biochemical principle of pathologic adaptation.

Factors and agents that are known to cause or influence the disease process of "chronic toxicity" are recognized by the National Institute of Occupational Safety and Health, and other research arms of the government. These factors and agents are known as "toxicants", "toxic hazards", "toxicant health hazards" or similar terminology related to chemical or physical health hazards known by these government agencies to cause "chronic toxicity".

The principle of "chronic toxicity" is integrated into the purpose of the Occupational Safety and Health Act as per SEC. 2. Congressional Findings and Purpose *"The Congress finds that personal injuries and illnesses arising out of work situations impose a substantial burden upon, and are a hindrance to, interstate commerce in terms of lost production, wage loss, medical expenses, and disability compensation payments."*

The principle of "chronic toxicity" is integrated into the purpose of the Mine Safety and Health Act *"(c) there is an urgent need to provide more effective means and measures for improving the working conditions and practices in the Nation's coal or other mines--- in order to prevent occupational diseases originating in such mines;"---"(f) ---the loss of income to operators and miners as a result of --- occupationally caused diseases unduly impedes and burdens commerce;"*

The enterprise risk management scheme fraudulently circumvents the purpose of this federal occupational health and safety law.

The principle of "chronic toxicity" was integrated into the former West Virginia State Workers' Compensation Law.

The principle of "chronic toxicity" is integrated into West Virginia Public Health Law, and is a purpose of the state in maintaining hazardous exposure data and population health statistics in protecting the health of children and adults in West Virginia from the harm of agents known to cause "chronic toxicity" as per state law *§16-3A-2. Hazardous materials; duties of the director of the department of health; requests for information;*

*penalties; enforcement. (a) The director of the West Virginia department of health shall-- - establish a list of hazardous materials, including their treatment and effect, which have been determined to be, or are suspected to be hazardous or toxic to human health.*

The enterprise risk management scheme fraudulently circumvents the purpose of this state worker and public health law.

The means of the enterprise is defined by a pattern of predicate acts that will be developed through the count sections. These acts insult the democratic process, violates both federal and state worker and public health law, endangers worker and public health, and hinders commerce as defined by Congress in the Occupational Safety and Health Act and the Mine Safety and Health Act.

Acts of the enterprise included those calculated to destroy the business and professional reputation of Plaintiff

The illegal acts of the "enterprise" are counts that are grouped in this action for consideration under the appropriate state and federal definitions for the illegal acts of the enterprise as they relate under federal RICO law.

A measure of the success of the enterprise are the scope of the counts addressing the hindering of commerce by enterprise action illegally countering the purpose of the federal Occupational Safety and Health Act and Mine Safety and Health Act through a scheme to control the reporting of occupational disease.

The enterprise scheme is dependant upon the successful exploitation of physicians as public officials to the corruption of the public trust of these defendant physicians.

The most influential occupational physicians to work under appointment for the West Virginia Workers Compensation Commission willfully breached statutory duty to the West Virginia worker in exchange for self-gain from enterprise interest.

The enterprise within West Virginia that is action oriented to control medicine, state agencies and state policy makers.

To the worker who has knowledge of laboring with exposure to the "toxicant" health hazards fraudulently concealed by the actions of the enterprise, the effect of the enterprise forces the West Virginia worker into a condition of involuntary servitude.

The evidence of West Virginia groups are presented in this action to illustrate by the evidence of these worker groups the acts of the enterprise that maintain them in servitude. Talon workers, coal preparation plant workers, dry cleaner workers and float sink workers. Although the principle evidence for which these worker groups are presented is as evidence that relates to relevant RICO counts concerning commerce, conspiracy, and manipulation of "evidence" upon which the fraudulent enterprise "evidence based guidelines" are based, the legal definition of involuntary servitude compares so closely to the definition of voluntary consent in the congressionally mandated Belmont Report, and the ethical breach in lack of it, that this argument as to a basic human rights violation of the West Virginia worker as a consequence of the illegal acts of the enterprise must be argued.

Marsh Fork Elementary School is presented as evidence of the activity of the enterprise subverting West Virginia public health law to the endangerment of public health.

Finally, this action is a last resort by Dr. Kostenko. The evidence of the enterprise's illegal acts causing this action had been presented to the former West Virginia Workers' Compensation Executive Director Greg Burton with the response of enterprise members within the Commission committing further acts with the object to cripple and eliminate the practice of Dr. Kostenko.

**Means of enterprise scheme-State Government collusion**

Gubernatorial administrations, finishing with Gov. Manchin, were dependant on the executive branch corruption of Workers Compensation to realize the political end of perceived "saving workers compensation".

## The Enterprise scheme to Plaintiff

Plaintiff was employed by the state of West Virginia through the states Viet Nam Veterans "Agent Orange Assistance" program in 1987. An osteopathic general practitioner, Plaintiff applied basic principles of toxicology in gathering evidence from this group. The Viet Nam veteran was to be the evidence to understand the effects of the experiences of the Veteran to their current state of health.

The state offered no evaluation guidelines for the disease of chronic toxicity as may by proportioned to service dioxin exposure. The principles as may apply to such guidelines were at that time well established, and taught in basic medical school curriculums. Topics such as informed consent, science of causality, dose effect relationships, and the mechanism of the disease of chronic toxicity are basic to primary medicine. To the Veteran groups for whom plaintiff had employment by the state with duty to evaluate, these principles were reliably applied in clinical practice to the evaluation of about one thousand West Virginia Viet Nam Veterans.

By 1990 plaintiff had diagnosed the first case of chronic toxicity influenced by coal prep plant chemicals in a 42 y/o male named Mr. D.P. With a diagnosis that has been repeatedly and independently confirmed, this man rapidly progressed to a dementia with elements of parkinsonism.

This was a case of non-coal dust occupational disease caused by chemical toxicants. Yet at the time, neither the Plaintiff, the patient, nor any other resource yielded accessibility to the chemical toxicant health hazards inherent to his work.

By order of an administrative law judge a list of prep plant toxicant hazards was yielded from his employer. In time, Plaintiff would learn that this list concealed most of the

26

actual toxicant hazards inherent to the operation of any coal prep plant involved in fine coal recovery.

Co-workers who took his place developed similar disease of chronic toxicity, with brain symptoms, and other multi-systemic manifestations that flowed logically from the warnings on the discovered material data safety sheets for the toxicants inherent to their employment.

In an Administrative Law Judge decision upholding the compensability of occupational disease for a co-worker of Mr. D.P. is this statement from a report by Dr. Ducatman, West Virginia University School of Medicine (Begin Exhibit 2001-05-21) *"Dr. Ducatman found Mr. S.() to be a very ill individual. The doctor found the Claimant to have a Parkinson like syndrome, memory loss and dementia, cortical atrophy and some miscellaneous neurological findings. The doctor opined that although the literature to date is unconvincing concerning its exposure-outcome relationship, he has now seen or reviewed records from at least four patients with some form of movement disorder and exposure to flocculent. The exposed workers came from the coal and sewage treatment industries. The doctor expressed concern that we may be seeing a new exposure-disease relationship, possibly caused by unsuspected acrylamide monomer or other products in flocculent. The doctor concluded by indicting it is possible that Franklin S.() has an occupational illness, heretofore considered unlikely by me, by NIOSH and frankly by experts everywhere, based upon current tomcologic understanding. He expressed concern about the, possibility of a new disease entity from a public health prospective."*

These occupational medicine opinions of Dr Ducatman are to the purpose federal labor law as the Occupation Safety and Health Act mandates for worker safety;
 *(6) by exploring ways to discover latent diseases, establishing causal connections between diseases and work in environmental conditions, and conducting other research relating to health problems, in recognition of the fact that occupational health standards present problems often different from those involved in occupational safety;*

*(7) by providing medical criteria which will assure insofar as practicable that no employee will suffer diminished health, functional capacity, or life expectancy as a result of his work experience;*

By the mid 1990s, Plaintiff had diagnosed the first chemical belt splicer with the disease of chronic toxicity from toluene exposure. On a critical occasion this patient with his wife presented to Plaintiff prior to an independent medical examination scheduled by the Commission. Concerned with feeling particularly ill that day, Plaintiff advised the patient that this IME was an opportunity to gain a specialty evaluation of his chronic disease condition. The patient kept this appointment and was informed at this appointment by the evaluating physician that there was nothing wrong with him. This patient by advice of Plaintiff immediately presented to Raleigh General Hospital, where a diagnosis of pneumonia was made, and within 48 hours was transferred to West Virginia University in renal shutdown.

This was the first experience of Plaintiff that the IME system utilized by the Commission or employers may be suspect as to the reliable application of medical principles for the understanding of toxicant influenced occupational disease, and the reliable application of lawful occupational safety and health principles to understand the workers and appreciate the evidence of the worker.

By 1996 the article <u>Two Case Reports of Neurological Disease in Coal Mine Preparation Plant Workers</u> appears in the American Journal of Industrial Medicine. The author is Karen Mulloy DO from the Dept of Family and Community Health, Marshal University School of Medicine, Huntington WV.

The article title is self-explanatory to the findings of Dr. Mulloy, and concludes with (Begin Exhibit 1996) *"These two cases highlight the need to reemphasize two basic tenents of occupational safety. First, there arte no accident-prone workers, only conditions at the work site that lead to accidents. Careful investigation of all accidents will help to uncover correctable conditions to protect all workers.*

*Second, better housekeeping (engineering and administrative controls) and the use of correct personal protection will reduce exposures. A workforce informed as to the dangers to health from exposures at work will help to lessen exposures by increasing compliance in safe work habits and the use of protective equipment. "*

By 1997 it had became clear that the Coal Prep Plant work environment, and the evidence of the workers, were woefully inadequate for any physician in southern West Virginia to know. There were no medical evaluation guidelines that included the nature of the work environment, the process of the disease of chronic toxicity, or the evidence of the workers.

By 1998 Plaintiff had begun classes for the purpose of educating himself and coal prep plant workers as to the environment of the prep plant, and to engage in open discussion as to the experiences and knowledge of the Prep plant workers. These classes met every two weeks through to the end of 2003.

Copies of meeting notes were sent to the Commission, with invitation for input and criticism by the Commissions Office of Medical Services.

August 1998 Defendant Becker MD examined and prepared a report on Mrs. B.L., a drycleaner worker. Mrs. B.L. paid Becker MD for this evaluation and for related studies. Becker MD's report was generated and sent to the patient May 5th 1999, some 9 months after her initial presentation (Exhibit 1999-05-05). The report of Becker MD is on Marshal University letterhead, from the same department as Karen Mulloy DO, and conspicuously omitted the application of the " basic tenets of occupational safety" as related by Mulloy DO in her <u>Two Case Reports of Neurological Disease in Coal Mine Preparation Plant Workers</u>. These two basic tenets being *"1) conditions at the work site that lead to accidents where careful investigation of all accidents will help to uncover correctable conditions to protect all workers and 2) better housekeeping (engineering*

*and administrative controls) and the use of correct personal protection to reduce
exposures. (in that) a workforce informed as to the dangers to health from exposures at
work will help to lessen exposures by increasing compliance in safe work habits and the
use of protective equipment.*

Becker MD's report (Exhibit 1999-05-05) shows that he returned Mrs. B.L. to the messy
trichloroethylene contaminated dry cleaning work environment she had complained of to
Dr. Becker without discussion to inform her as to the dangers inherent to dry-cleaning
work, no discussion to help uncover correctable conditions to protect Mrs. B.L., to
protect her co-workers, or to limit the liability of her employer. This act violated the
purpose of Federal Labor Law.

Through 1999, the Commission ceased payment for procedures preformed by Plaintiff.

January 4th 2000 Plaintiff sends letter to Steven Cavender, Workers Compensation
Division, Office of Medical Services, WVWCC Re: Plaintiff not receiving payment for
services, and requesting clarification as to why not. (Exhibit 2000-01-04)

On February 9th 2000 Plaintiff receives this response from the Office of Medical Services
by Steve Cavender, (Exhibit 2000-02-09) *"On February 15th, 2000 I will be sending 2
employees from my Health Care Standards and Review unit to review medical records on
Workers Compensation claimants".*

Following a week in the office, the unit conducted an exit interview with Plaintiff.
February 28th, 2000 plaintiff sends letter to then Commissioner Vieweg requesting
clarification as to how the Commission develops treatment guidelines. (Exhibit 2000-02-
28)

Plaintiff presents to the Commissions Mary Healy JD at the Commissions offices in
Charleston WV in further follow-up to the Commissions investigation of February 2000.
Mary Healy JD at this time is the chief legal council to then Commissioner Vieweg. Mary

Healy JD was also legal council to the Health Care Advisory Panel (HCAP), and to the Commissions fraud unit. Plaintiff came to understand during this meeting that physicians within the commission had requested action through the fraud unit to terminate Plaintiff as a provider. Such effort as the Office of Medical Services "chart review" had failed to find cause for such termination. During discussion, Plaintiff came to understand that a group of physicians within the Commission formed a Health Care Advisory Panel (HCAP) with the duty to form medical evaluation and treatment guidelines. Plaintiff came to understand that issues of medical understanding of the workers presenting to Plaintiff could be presented to this forum. Plaintiff in reviewing the statute defining HCAP duty came to understand that the HCAP was empowered by compensation law WVC §23-4-3b to be by statute the medical evaluation and treatment guideline architects for the state.

By WVC §23-4-3b *(a) The commission shall establish a health care advisory panel consisting of representatives of the various branches and specialties among health care providers in this state. There shall be a minimum of five members of the health care advisory panel who shall receive reasonable compensation for their services and reimbursement for reasonable actual expenses.--- The panel shall:*

*(1) Establish guidelines for the health care which is reasonably required for the treatment of the various types of injuries and occupational diseases within the meaning of section three of this article;*

*(2) Establish protocols and procedures for the performance of examinations or evaluations performed by physicians or medical examiners pursuant to sections seven-a and eight of this article;*

*(3) Assist the commission in establishing guidelines for the evaluation of the care provided by health care providers to injured employees for purposes of section three-c of this article;*

*(4) Assist the commission in establishing guidelines regarding the anticipated period of disability for the various types of injuries pursuant to subsection (b), section seven-a of this article; and*

*(5) Assist the commission in establishing appropriate professional review of requests by health care providers to exceed the guidelines for treatment of injuries and occupational diseases established pursuant to subdivision (1) of this section.*

Plaintiff notes that WVC §23-4-3b (a)(2) is to medical evaluation guidelines, that WVC §23-4-3b (1) is to medical treatment guideline of injuries and occupational disease, and WVC §23-4-3b (a)(4) is to disability duration guidelines.

May 1st, 2000 Plaintiff sends letter to Commissions legal council to the HCAP Mary Healy. Notice of given as to intent of Plaintiff to present to the public meeting component of the HCAP scheduled for May 25th 2000 as follows, (Begin Exhibit 2000-05-01).

*Dear Ms. Healey:*

*Upon the date of the next Health Care Advisory Panel Meeting, it is my intention to attend.*

*Since it is a public meeting and since a large purpose of my attending will be to address the public need, we will be requesting certain accommodations for the facilities of this HCAP meeting.*

*1) We will need accommodations for approximately thirty (30) individuals to assist with presentation to the meeting. These will include variably patient's who represent the acrylamide issue at the work place environment, politicians, physicians, possibly the press and attorney groups who are pertinent to the issues to be discussed.*

*2) At the time of presentation, we will be questioning the framework or facility that Workers' Compensation has to address chemical poisoning issues. Support will be offered from Marshall University in Huntington and West Virginia University in Morgantown dealing with questions that these institutions have raised for this patient population.*

*3) An integrative system of thought for evaluation and treatment of patient's with chemical injuries will be reviewed.*

*I understand that the Health Care Advisory Panel is set up to advise the Commissioner.*

*I look forward to the assistance of the HCAP panel in this patient population, but I also look forward to understanding clearly what their advice to the Commissioner will be.*

*NOTE: I have sent in "novels" of written information pertinent to this patient population and the problem. I have little confidence that I can mount an effective paper argument on this issue. It is a social, legal, and medical issue that seems advisable to reflect off the Healthcare Advisory Panel, to define their interest and efficacy, prior to addressing these issues in a higher arena.*

*The HCAP panel will find that we are addressing issues of industrial health effecting workers pertinent to their purpose.* (End Exhibit)

Plaintiff purpose to the HCAP was the presentation of the evidence of a few West Virginia worker groups, and the discussion of accepted medical principles to be applied in medical evaluation guidelines as per the statutory duty of the HCAP.

May 23rd, 2000, the Commissions Office of Medical Services medical director, and HCAP member Frank W. Crast, MD, MPH writes to Plaintiff (Exh. 2000-05-23) *"The priority mission of this newly formed HCAP is to revise existing, and promulgate new, health care guidelines that will have a global impact on the Division's medical management of claims. Necessarily, this presently precludes addressing individual, specific issues and claims at HCAP meetings."*

Plaintiff intends to review medical principles as may be reliably applied to such guideline formation, and to present the evidence of worker groups to be considered in the development of such guidelines to the understanding, or evaluation, of suck workers. This is to the lawful purpose of the HCAP under the state statute that defines the purpose of the HCAP, and the lawful purpose of federal Labor Law.

The response by Crast MD seems to discourage such presentation. Upon physical constraints of the HCAP meeting room as defined by Crast MD, Plaintiff limits his presentation to a few workers.

May 25th 2000 plaintiff presents a short paper to the HCAP as follows: (Begin Exhibit 2000-05-25a)

*The purpose for presenting to the Health Care Advisory Panel meeting of 05/25/00*

*1)     Group of patients who present with a cluster that appears to represent an occupational injury.*

*2)     To ask the Health Care Advisory panel what form or structure they have organized within Workers' Compensation for the evaluation of patients with potential chemical injuries.*

*3)     To propose to the Health Care Advisory Panel minimal parameters for the structure of a medical review of chemical injuries at the work place.*

*4)     Presentation*

*1) Huntington paper*

*2) Morgantown study paper*

*3) 1975 study paper*

*5)     Present the 1993 Coal Preparation Plant study.*


*Example of a proposal to evaluate patient questions.*

*The evaluation process would have to at least evaluate:*

*1) What is the injury and its symptomatic presentation?*

*2) What is the level of injury, i.e., nuclear, mitochondrial, cell membrane, systemic versus organ or tissue specific?*

*3) What are reasonable tools to evaluate the patient condition?*

*4) What are reasonable tools to evaluate the work place chemical environment?*

*5) Who shares responsibilities in the liability of chemical injuries, i.e.*

*chemical companies versus regulators versus the health care system itself?*

*Principal. Avoid the blind leading the blind.*

*The people who represent this group or cluster are the study group.*

*There is no other patient population to refer to. It is not ethical to take a group of people and purposely expose them to these two chemicals for the purpose of evaluating the toxic affects. We only do this with drugs.*

*Not since the World War II experiments on human beings by the German Nazi's or the Japanese camps in China or during the Cold War by the U.S. Government with mixing people and plutonium have we had such a large group of people who have been unwillingly taking part in so large a study with such powerful influences on the lives of themselves and their families.*

*The purpose of the Health Care Advisory Panel must imply a moral imperative to take responsibility for evaluation of the problem. An evaluation group would seem reasonable to at minimum include:*

*1) A chemical engineer. An individual that understands the kinetics of chemicals and the kinetics of polymers and their bonds. He also understands the complexity of the work place chemical environment and also the chemical degradation--- that may be in the work place environment.*

*2) A biochemist. The effect of chemicals, the degradation products biologically of chemicals and the subsequent metabolic consequences of these chemicals.*

*3) A physiologist/physiologists with knowledge of neurophysiology.*

*4) A neuro-psychiatrist who understands the research application of more objective studies like PET scan studies.*

*5) A medical clinician who can coordinate the patients as a group as well as the basic science that applies to the group. This then would infer a physician or group of physicians who appreciate the implications of their work on public health policy. Typically this infers physician group who are primarily responsible to their patient population.* (End of exhibit)

Minutes of this meeting (Exhibit 2000-05-25b) demonstrate Plaintiff presented the above handout, reviewed supportive work from both Marshal University Medical School and

the WVU School of Medicine as to the medical understanding of the presented work groups, and presented workers representative of these work groups as evidence the need of evaluation guidelines for occupational disease in West Virginia, and as evidence to be considered in such guidelines.

May 25th 2000 Plaintiff is pleading to this HCAP to perform the non-discretionary duty of the HCAP to the lawful formation of medical evaluation guidelines to understand toxicant influenced occupational disease, and lawful formation of medical treatment guidelines for the occupational disease of chronic toxicity. Plaintiff is pleading to this HCAP for the application of medical principles to the formation of these guidelines, including the evidence of worker groups for whom these lawful guideline serve to protect.

Meeting minutes show defendants Becker MD and Martin MD as HCAP members. The minutes show that Becker did not attend this meeting, and that Martin MD exited moments before the presentation by Plaintiff. Minutes show that Mrs. B.L. as a former patient evaluated by Becker MD was of the workers presented for the evidence of her work experience. (Exhibit 2000-05-25b)

Meeting minutes are somewhat garbled and the recording secretary apologized for this, explaining problems due to the taping device. Plaintiff testimony is not verbatim, and several verbal discussions were not transcribed. It is clear that the Chairman of this HCAP curtly dismissed Plaintiff on three occasions during presentation by Plaintiff.

In addressing the need for guidelines, Chairman Crast MD stated *"We have a process of IME experts. When we evaluate a certain type problem either the treating physician refers them to the expert. What I want to say, is that I have given you time and we have a whole agenda yet to go. We are going to have to get back to business, but what I promise you is that we will get back with you."*

Plaintiff responds *"We will expect your response."*

Plaintiff was not knowing in 2000 that principle Commission physicians, such as HCAP physicians Becker MD and Martin MD, were associating with any guideline association such as WLDI.

Plaintiff received no promised response from the Health Care Advisory Panel.

August 3rd 2000 Plaintiff sends letter to the Commissions Office of Medical Services addressed to Mary Healey, RN, JD WV Workers Compensation Office of Medical Services (Begin Exhibit 2000-08-03) *I thought would drop you a note letting you know that we are having our next Acrylamide meeting on August 3, 2000. I would like to extend an invitation for either you or any of the occupational medicine or HCAP panel members that would like to attend. I think it would be not an unreasonable introduction to what is really happening involving this problem. Since the ramifications of our evaluation and of this problem have implications for industrial health and potentially catastrophic health care problem within Workers Compensation, I tend to assert the need for Workers Compensation to be proactive in this situation. I know this is a sticky situation politically, balancing potentially patient needs with perception of the medical review and advisory people that you work with, but the reality of the patients' conditions and their needs eventually will mandate attention and evolution of evaluation and treatment protocols---.* (End Exhibit)

Plaintiff received no response from physician public officials within the Commission.

Through the summer and fall of 2000, Plaintiff receives numerous accounts from his patients with workers compensation that Commission claims managers are pressuring these patients to change from the service of Plaintiff.

Contained within the professional records of Plaintiff are notes prepared by the patients in their own words to document their interactions with these Office of Medical Services Claims Managers. The following are a few examples:

August 23rd, 2000 Mr. T.K. writes (Begin Exhibit 2000-08-23.) *"On august 17, 2000 I was on the telephone speaking with Ms. Susan Huffman, my case worker with WV Workers Compensation. She made a remark that shocked me. She said "If you tell anyone what I am about to say to you, I'll deny it and so will my co-worker sitting here behind me, because I could lose my job". Then she asked if I had considered seeing another doctor, to which I replied that it had crossed my mind. Her response was, "it needs to do more that cross your mind. Do you have a family doctor or someone else that you could go to?" I was stunned at what she was telling me and so did not immediately respond. She then said, "Dr. Kostenko was a chiropractor". I replied "Oh he is." To which she replied, Well he leans in that direction.---I felt like she was basically telling me that if I didn't change doctors I was screwed."* (End Exhibit)

September 6th 2000, Mr. R.B. writes (Begin Exhibit 2000-09-06.) *"During a phone conversation on September 5th with Shirley Newman, my case worker---she said that--- they were also going to deny ---office visits with Dr. Kostenko. She told me that she would approve me to go to a pain clinic in Charleston."* (End Exhibit)

September 7th 2000, Ms. T.T. writes (Begin Exhibit 2000-09-07) *" ---we had sent in a request to WV Workers Compensation for a change of Physician. --- I asked Ms. Pettry if she could give ma an authorization number over the phone so that he could go ahead and be seen. She responded that no they didn't do that anymore because they were watching every move that Dr. Kostenko was making. She also said that everything that comes from his office has to go before a medical review board before a decision is made."---(*End Exhibit)

Plaintiff notes that as these claims workers were dependant to the leadership of principle physician public officials within the Commissions Office of Medical Services; then these claims manager comments represented ongoing animosity of principle physicians within the Commission towards Plaintiff.

To such animosity as seemed perpetual from Commission physicians to Plaintiff, is the evidence of this Spring 2000 American Board of Independent Medical Examiners Newsletter. Commission physician Ranavaya MD is Editor in Chief, Becker MD editorial of this article (Begin Exhibit 2000-03-01)

Twenty Steps to Minimizing Independent Medical Examination Risks by Christopher R. Brigham, MD--- *The physician performing independent medical evaluations faces several potential legal liabilities, even though there is no physician/patient relationship-- -. The circumstances of performing an IME are unique, since there is no physician/patient relationship and this work may or may not be defined within the scope of medical practice. The following are some suggestions to reduce these risks. ---*
*4. Do not establish a physician / patient relationship.*
*By definition, when you perform an independent medical evaluation you are not establishing a physician / patient relationship. ---. If there were a physician/patient relationship, then the physician would owe a duty to the patient to disclose any adverse conditions and to notify the patient of any risks of future health problems related to the condition.* (End Exhibit 2000-03-01)

Plaintiff could not know that concurrent to Plaintiff's appeal to the HCAP for ethical application of HCAP duty to medical evaluation and medical treatment guideline formation, physicians within the Commissions OMS and HCAP were developing a system of belief through their associations with WLDI and the ABIME so as to rationalize the subrogation their statutory duty to the West Virginia worker to special interests.

April 4th, 2001 Plaintiff receives a call from the Commission new acting medical director, Ranavaya MD. Plaintiff response to this phone call is this letter to Ranavaya MD (Begin Exhibit 2001-04-27, skip to 6 pages to avoid this exhibit.)
*Dear Mohammad: I appreciated your phone call of 4/05/01. I like the thought that you were establishing a dialogue with me. You asked me one principal question, followed by a statement. The question was, "What is the purpose of these tests?" The statement dealt*

*with what may constitute experimental medicine. I appreciate that you refer to me as a colleague.*

*The topic of your call was to understand my proposed utilization of hepatic Phase I and Phase II detoxification tests, and tests of levels of reduced glutathione and superoxide dismutase.*

*At the time of our phone conversation I deferred a detailed verbal response to your question. This written response to our conversation will be relatively brief and the intent will be to lay a foundation for more specific points or arguments to be made at a later date.*

*I found myself perplexed following our conversation. Several concerns were raised by your question as to the purpose of obtaining these tests.*

*1.      What is the medical system in place to serve the health of individuals with injuries that are associated with chronic pain?*

*2.      Does this medical system appreciate the differences between patient's with injuries associated with chronic pain and the pain associated with acute injuries?*

*3.      Does this medical system recognize that individuals with chronic pain have systemic consequences of their suffering with affects to multiple body systems and their overall health in general?*

*A.      The autonomic nervous system?*

*B.      The immune system?*

*C.      The upper and lower gastrointestinal systems?*

*D.      The endocrine system with affects on hormones produced by the gonads and adrenals as well as insulin resistance?*

*4.      Is there appreciation that testosterone and DHEA in some conditions may tend to drop, and that glucose tolerance tests are frequently impaired and why this would be so?*

*5.      Hepatic stress with inducement or exhaustion of Phase I or Phase II hepatic detoxification paths and the subsequent consequence to systemic and muscloskeletal health and why this would be so.*